IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KEAHOLE POINT FISH LLC, | ) | CIVIL NO. 11-00675 KSC |
| | ) | |
|     Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART |
|     vs. | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT; ORDER |
| SKRETTING CANADA INC. aka | ) | DENYING AS MOOT |
| SKRETTING NORTH AMERICA; | ) | 1) DEFENDANT'S |
| DOES 1-10, | ) | SUPPLEMENTAL MOTION FOR |
| | ) | SUMMARY JUDGMENT ON THE |
|     Defendants. | ) | DOCTRINE OF RES IPSA |
| _____ | ) | LOQUITUR AND ANY SIMILAR |
| | ) | THEORIES AND |
| SKRETTING CANADA, INC. aka | ) | 2) PLAINTIFF'S MOTION FOR |
| SKRETTING NORTH AMERICA, | ) | PARTIAL SUMMARY JUDGMENT |
| | ) | RE: CIRCUMSTANTIAL |
|     Counterclaimant, | ) | EVIDENCE UNDER STRICT |
| | ) | PRODUCTS LIABILITY |
|     vs. | ) | ("QUASI" - *RES IPSA*) |
| | ) | |
| KEAHOLE POINT FISH LLC; | ) | |
| DOES 1-10, | ) | |
| | ) | |
|     Counter-Defendants. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING
AS MOOT 1) DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY
JUDGMENT ON THE DOCTRINE OF RES IPSA LOQUITUR AND ANY
SIMILAR THEORIES AND 2) PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: CIRCUMSTANTIAL EVIDENCE UNDER
STRICT PRODUCTS LIABILITY ("QUASI" - *RES IPSA*)

Before the Court are 1) Defendant Skretting

Canada Inc. aka Skretting North America's ("Defendant")

Motion for Summary Judgment, filed May 17, 2013;

2) Defendant's Supplemental Motion for Summary Judgment on the Doctrine of Res Ipsa Loquitur and Any Similar Theories, filed July 8, 2013; and 3) Plaintiff Keahole Point Fish LLC's ("Plaintiff") Motion for Partial Summary Judgment Re: Circumstantial Evidence Under Strict Products Liability ("Quasi" - *Res Ipsa*), filed July 8, 2013.

These matters came on for hearing on August 29, 2013. David Nakashima, Esq., appeared on behalf of Plaintiff. Jeffrey Johnson, Esq., Patricia NaPier, Esq., and Randall Whattoff, Esq., appeared on behalf of Defendant. After careful consideration of the motions, the supporting and opposing memoranda, the arguments of counsel, and the applicable law, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendant's Motion, and DENIES AS MOOT Defendant's Supplemental Motion and Plaintiff's Motion for the reasons set forth below.

BACKGROUND

I.   Factual History

This action arises out of allegations that the Kona Pacific poultry meal feed that Plaintiff purchased

2

from Defendant was defective because of nutrient deficiencies, namely taurine, and inferior ingredients.

A.   <u>Kona Blue</u>

In late 2005 or early 2006, Kona Blue, Plaintiff's predecessor, requested that Defendant prepare a custom diet for its *Seriola rivoliana*. Def.'s CSF, Decl. of Jeffrey C. Johnson ("Johnson Decl."), Ex. A.[1] At Kona Blue's request, Defendant provided Kona Blue with four feed options with reductions in fishmeal in December 2007, including one option that substituted poultry meal for some fishmeal. <u>Id.</u> Kona Blue selected the poultry meal diet, resulting in a possible annual savings of $150,000 in feed costs. Def.'s CSF, Decl. of Christopher Beattie ("Beattie Decl.") at ¶ 5 and Ex. A.[2]

─────────────

[1]   Exhibits A, C, E, F, H, J, M, O, and P to the Johnson Declaration are filed under seal. Exhibits A, C, and D attached to Defendant's Reply CSF are filed under seal. The Court will limit the facts to those provided in the parties' public filings, even if citing to sealed exhibits.

[2]   Exhibit H to the Beattie Declaration is filed under seal.

In December 2007, Defendant began shipping the Kona Pacific poultry meal feed to Kona Blue.  Id., Johnson Decl., Ex. D.  Since 2007, all product sheets for the Kona Pacific diet contained the following disclaimer:  "Individual results from the use of Skretting feed products may vary due to management, environment, genetic, health and sanitation differences.  Therefore, Skretting does not warrant or guarantee individual results and reserves the right to modify it without prior notice."  Id., Beattie Decl. at ¶¶ 11-12, Exs. E & F.  Kona Blue began feeding the Kona Pacific poultry meal feed to its *Seriola rivoliana* in early 2008.  Id., Johnson Decl., Ex. D.  According to Neil Sims, Kona Blue's president, Chris Beattie, Defendant's general manager, advised him that Kona Pacific feed would provide a balanced diet.  Id., Johnson Decl., Ex. E; Pl.'s CSF, Additional Material Facts ("AMF") at ¶ 3 & Ex. 3.[3]  The Kona Pacific feed formula was based on the nutritional and dietary

---

[3]  Exhibits 2, 3, 6, 8, 10, 13, 16, and 18 to Plaintiff's CSF are filed under seal.

requirements of salmon.  Pl.'s CSF, AMF at ¶¶ 6-8.

In July 2008, Kona Blue reported to Defendant
that it experienced some of the best fish survival in
company history.  Pl.'s CSF, Ex. 20.  In October 2008,
Kona Blue complained of slower growth and reduced feed
response.  Id., AMF at ¶¶ 6-9.  Eventually, Kona Blue
determined that overstocking, strep infection, and skin
flukes caused the issues, and mortality rates in 2008
were in fact low.  Def.'s CSF, Johnson Decl., Ex. D;
Def.'s Reply CSF at ¶¶ 6-8.  Defendant represents that
Kona Blue thereafter reported successful results for
nearly two years while its fish were consuming the Kona
Pacific poultry meal feed.  Def.'s CSF, Beattie Decl.
at ¶ 6.  At the end of 2009, Kona Blue was successfully
harvesting *Seriola rivoliana* at average weights over
four-and-a-half pounds, which was at or exceeding the
farm's historical harvest weights.  Id., Johnson Decl.,
Exs. A & D.

   B.   Acquisition by Plaintiff of Kona Blue

In February 2010, Plaintiff assumed control of

the aquafarm.  Id., Beattie Decl., Ex. D.  Prior to its acquisition of the farm, Plaintiff conducted due diligence with respect to Kona Blue's practices, harvest data, and financial data.  Id., Johnson Decl., Exs. E & F.  Kona Blue disclosed that it requested that Defendant replace some fishmeal with poultry meal, and recommended another feed company to enable Plaintiff to consider other feeds.  Id., Johnson Decl., Ex. E.

Plaintiff claims that after it began operations, Defendant further reduced the amount of fishmeal in the feed and replaced it with alternative protein materials that contained less taurine by weight.  Pl.'s CSF, AMF at ¶ 9, Ex. 11.  Defendant disputes this allegation, and maintains that not only did the formula not change when Plaintiff purchased the farm, but that there was no change to the formula from late 2007 until July 2011, when Plaintiff requested that the formulation return to the original Kona Pacific diet that did not include poultry meal.  Def.'s CSF, Johnson Decl., Ex. C; Beattie Decl., Ex. H.

Plaintiff represents that the purported fishmeal reduction resulted in poor eating and slowed growth. Pl.'s CSF, AMF at ¶ 10, Ex. 4.   In addition, Plaintiff noticed increased susceptibility to bacterial infections, poor reaction to routine treatments, and abnormally high daily mortalities.  Id.  When Plaintiff queried Defendant about whether it had changed the formulation of the feed, Mr. Beattie responded that while the ingredients may vary over time, the formulation had not changed at all for a couple of years.  Pl.'s CSF, AMF at ¶ 11, Ex. 2; Def.'s Reply CSF at ¶ 11; Def.'s CSF, Johnson Decl., Ex. B.

    C.   <u>The Parties' Agreement Regarding the Purchase of Kona Pacific Feed</u>

On January 13, 2010, Todd Madsen, Plaintiff's president, signed Defendant's Customer Record/Credit Application.  The Application stated:  "We hereby jointly and severally agree to pay your account . . . according to your terms of sale and to pay interest at the rate set by [Defendant] on all amounts in arrears as outlined in the terms and conditions of sale."

7

Def.'s CSF, Beattie Decl., Ex. B.  Invoices
accompanying each order contained the terms and
conditions of the sale of the feed, including payment
terms, items purchased, quantity, and price.  Id.,
Beattie Decl., Ex. C.  Defendant also provided
Plaintiff with product sheets containing its disclaimer
that individual results may vary and that it does not
warrant or guarantee individual results.[4]  Id., Johnson
Decl., Ex. A; Beattie Decl., Ex. F.

     D.   Plaintiff's Switch to High Fishmeal Feed

          In early 2011, Plaintiff hypothesized that
taurine deficiency was the cause of problems with its
fish.  Id., Johnson Decl., Ex. B.  In an email dated
May 18, 2011, Mr. Madsen inquired with Mr. Beattie
about ingredient information and indicated that
Plaintiff was investigating whether feed formulation
changes were contributing to growth issues.  Id.,
Beattie Decl., Ex. G.  On June 7, 2011, Gavin Shaw

---

     [4]  Plaintiff disputes that the language on the
product sheets are disclaimers as a matter of law.  The
Court uses the term disclaimer descriptively, and shall
discuss the legal sufficiency of the disclaimer below.

provided estimated taurine levels in the feed and calculated a weighted average of taurine for all feed sizes of approximately 0.17%.  Id., Johnson Decl., Ex. B.  Just one day prior, however, Plaintiff stopped purchasing the Kona Pacific poultry meal feed and ordered the high fishmeal feed.  Id., Beattie Decl., Ex. I.

In August 2011, Plaintiff began purchasing a high fishmeal feed from EWOS, Defendant's competitor. By Plaintiff's accounts, following the switch to the EWOS feed, the health of the fish improved quickly and dramatically, mortalities dropped, and Plaintiff has since successfully raised four more Cohorts.  Pl.'s CSF, Ex. 4.  The EWOS feed had a higher taurine content than the Kona Pacific poultry meal feed.

II.  Procedural History

Plaintiff commenced this action on November 3, 2011.  On December 22, 2011, Plaintiff filed a First Amended Complaint, asserting the following claims: 1) negligence (Count 1); 2) intentional

misrepresentation (Count 2); 3) negligent

misrepresentation (Count 3); 4) products liability

(Count 4); 5) implied warranty of merchantability

(Count 5); 6) implied warranty of fitness (Count 6);

and 7) unjust enrichment (Count 7).

Defendant filed a Counter-Complaint on December

29, 2011, alleging that Plaintiff breached its contract

with Defendant by ordering and taking possession of

Kona Pacific high fishmeal feed, but failing to pay

$36,548.60.

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when there is

no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law.  <u>See</u> Fed.

R. Civ. P. 56(a).  "A party seeking summary judgment

bears the initial burden of informing the court of the

basis for its motion and of identifying those portions

of the pleadings and discovery responses that

demonstrate the absence of a genuine issue of material

fact."  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d

978, 984 (9th Cir. 2007) (citing <u>Celotex Corp. v.</u>
<u>Citrate</u>, 477 U.S. 317, 323 (1986)); <u>T.W. Elec. Serv.,</u>
<u>Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630
(9th Cir. 1987).  In a motion for summary judgment, the
court must view the facts in the light most favorable
to the nonmoving party.  <u>State Farm Fire & Cas. Co. v.</u>
<u>Martin</u>, 872 F.2d 319, 320 (9th Cir. 1989).

Once the moving party has met its burden of
demonstrating the absence of any genuine issue of
material fact, the nonmoving party must set forth
specific facts showing that there is a genuine issue
for trial.  <u>T.W. Elec.</u>, 809 F.2d at 630; Fed. R. Civ.
P. 56(c).  The opposing party may not defeat a motion
for summary judgment in the absence of any significant
probative evidence tending to support its legal theory.
<u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d
1551, 1558 (9th Cir. 1991).  The nonmoving party cannot
stand on its pleadings, nor can it simply assert that
it will be able to discredit the movant's evidence at
trial.  <u>T.W. Elec.</u>, 809 F.2d at 630; <u>Blue Ocean</u>

11

Preservation Soc'y v. Watkins, 754 F. Supp. 1450, 1455
(D. Haw. 1991).

If the nonmoving party fails to assert specific
facts, beyond the mere allegations or denials in its
response, summary judgment, if appropriate, shall be
entered. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871,
884 (1990); Fed. R. Civ. P 56(e). There is no genuine
issue of fact if the opposing party fails to offer
evidence sufficient to establish the existence of an
element essential to that party's case. Celotex, 477
U.S. at 322; Citadel Holding Corp. v. Roven, 26 F.3d
960, 964 (9th Cir. 1994); Blue Ocean, 754 F. Supp. at
1455.

In considering a motion for summary judgment,
"the court's ultimate inquiry is to determine whether
the 'specific facts' set forth by the nonmoving party,
coupled with undisputed background or contextual facts,
are such that a rational or reasonable jury might
return a verdict in its favor based on that evidence."
T.W. Elec., 809 F.2d at 631 (citing Anderson v. Liberty

12

Lobby, 477 U.S. 242, 255 (1986)).  Inferences must be drawn in favor of the nonmoving party.  Id.  However, when the opposing party offers no direct evidence of a material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law.  Id. at 631-32.  If the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial.  Bator v. State of Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988)).

DISCUSSION

Defendant moves for summary judgment on all claims, including its counterclaim.  The Court addresses each argument in turn.

I.  Preemption

Defendant argues that it is entitled to summary judgment on Plaintiff's negligence, products liability, implied warranty of merchantability, and implied warranty of fitness claims because they are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"). Specifically, Defendant maintains that it could not have consistently satisfied Plaintiff's desired taurine levels without supplementing its fish feed with crystalline taurine, a food additive, in violation of 21 C.F.R. § 573.980.

Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.  Accordingly, "state laws that conflict with federal law are 'without effect.'"  Mut. Pharm. Co. v. Bartlett, ___ U.S. ___, 133 S. Ct. 2466, 2473 (2013) (citations omitted).  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts

14

state law; (2) state law actually conflicts with
federal law; or (3) federal law occupies a legislative
field to such an extent that it is reasonable to
conclude that Congress left no room for state
regulation in that field." Chae v. SLM Corp., 593 F.3d
936, 941 (9th Cir. 2010) (citations omitted).

The FDCA does not contain a preemption clause.
Riegel v. Medtronic, Inc., 552 U.S. 312, 339 (2008).
Even when there is an absence of an express preemption
provision, however, state law may be impliedly
preempted when "it is 'impossible for a private party
to comply with both state and federal requirements.'"
Id. (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79
(1990)); Fla. Lime & Avocado Growers, Inc. v. Paul, 373
U.S. 132, 142-43 (1963) (An inquiry into congressional
design is not required "where compliance of both
federal and state regulations is a physical
impossibility for one engaged in interstate
commerce.").

Conflict preemption, which Defendant argues applies here, implies Congress's intent to preempt state law to the extent there is conflict between federal and state law.  Whistler Invs., Inc. v. Depository Trust and Clearing Corp., 539 F.3d 1159, 1164 (9th Cir. 2008).  It arises when it is impossible for a party to comply with both federal and state law "or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Hunter v. Philip Morris USA, 582 F.3d 1039, 1046 (9th Cir. 2009) (citations omitted).  Showing preemption by impossibility is a "demanding defense."  Wyeth v. Levine, 555 U.S. 555, 573 (2009).

The FDCA presumes that food additives are unsafe until the Food and Drug Administration ("FDA") formally authorizes their use.  21 U.S.C. §§ 342, 348.  The FDCA defines "food additive" as

> any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise

16

> affecting the characteristics of any food
> . . . if such substance is not generally
> recognized, among experts qualified by
> scientific training and experience to
> evaluate its safety, as having been
> adequately shown through scientific
> procedures . . . to be safe under the
> conditions of its intended use.

21 U.S.C. § 321(s).  The FDA has deemed taurine safe

for use in animal feeds provided that "[i]t is added to

complete feeds so that the total taurine content does

not exceed 0.054 percent of the feed."  21 C.F.R.

§ 573.980(b).

Defendant asserts that given these restrictions

on taurine, successfully and consistently meeting

Plaintiff's taurine requirements would require illegal

supplementation of the feed with crystalline taurine, a

food additive, which would result in a conflict between

federal and state law.  Plaintiff claims that

Defendant, as well as EWOS, sold and manufactured feed

that met Plaintiff's minimum taurine level solely

through the use of fishmeal.  It is Plaintiff's

position that because naturally occurring taurine is

not a food additive, it does not implicate food

17

additive regulations.

The issue before the Court is whether federal law preempts Plaintiff's state law claims alleging that 1) Defendant's failure to produce and provide a fish feed that contained sufficient taurine caused it to breach its duty of care to Plaintiff; 2) the feed was defective in design and manufacture because it failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably forseeable manner; and 3) Defendant breached the implied warranties of fitness for purpose and merchantability by designing and manufacturing a defective feed that was not fit for consumption.

In evaluating preemption, the Court is

> guided by two cornerstones of . . . pre-emption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) (internal quotation marks omitted); see Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 (1963). Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field

18

> which the States have traditionally
> occupied,' ... [the court] 'start[s] with
> the assumption that the historic police
> powers of the States were not to be
> superseded by the Federal Act unless that
> was the clear and manifest purpose of
> Congress.'" <u>Lohr</u>, 518 U.S. at 485, 116 S.
> Ct. 2240 (quoting <u>Rice v. Santa Fe
> Elevator Corp.</u>, 331 U.S. 218, 230, 67 S.
> Ct. 1146, 91 L. Ed. 1447 (1947)).

<u>Wyeth,</u> 555 U.S. at 565 (alterations in original).

"[O]ne of the [FDCA's] core objectives is to ensure

that any product regulated by the FDA is 'safe' and

'effective' for its intended use." <u>Food and Drug

Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S.

120, 133 (2000). The mission of the FDA is to "protect

the public health by ensuring that . . . foods are

safe, wholesome, sanitary, and properly labeled." 21

U.S.C. § 393(b)(2).

For preemption to apply in the present case,

the facts would have to undisputably demonstrate that

Defendant could not manufacture a feed satisfying

Plaintiff's minimum taurine requirement without taurine

supplementation. As earlier discussed, taurine is a

food additive that can only be added to animal feed

under the limited circumstances set forth in 21 C.F.R.
§ 573.980.  Thus, any supplementation of Defendant's
feed with taurine would violate the FDCA and 21 C.F.R.
§ 573.980, and any liability resulting from Plaintiff's
state law claims would conflict with federal law.

Based on the record before the Court, genuine
issues of material fact exist that preclude summary
judgment.  Central to Plaintiff's negligence, products
liability, implied warranty of merchantability, and
implied warranty of fitness claims is Plaintiff's
belief that a feed must contain a specific range of
taurine to be optimal for *Seriola rivoliana*.  The
parties dispute Defendant's ability to manufacture a
feed meeting Defendant's minimum requirement without
supplementation.

Plaintiff cites test results of feed
manufactured by both Defendant and EWOS to support its
assertion that its minimum taurine requirement was met,
and could be met, through naturally occurring taurine
in fishmeal and other raw materials.  Defendant

20

challenges that the test results demonstrate that it was impossible to meet Plaintiff's taurine requirement and comply with federal law.  The Court agrees that the evidence tends to suggest that it would be difficult to consistently produce a feed with sufficient taurine.  However, because Defendant and EWOS have successfully done so, even if unreliably so, it is *possible*.  Viewing the evidence in the light most favorable to Plaintiff, there is a material factual dispute about whether Defendant could have manufactured a feed that included sufficient taurine without resorting to supplementation.[5]

---

[5]   Plaintiff additionally asserts that Defendant could have obtained a "generally recognized as safe" ("GRAS") determination, which would have permitted use of taurine supplementation.  In response, Defendant emphasizes that it had no obligation to obtain a GRAS determination, and that a GRAS determination does not create a legally binding exception to the FDA regulation of food additives.  Plaintiff has not cited any legal authority requiring a defendant to take all possible steps before preemption could apply.  Plaintiff has obtained a GRAS determination for taurine supplementation in fish feed.  However, a GRAS determination obtained after the relevant time period has no bearing on the applicability of preemption.  The Court's inquiry focuses on whether Plaintiff's state law claims would impose a duty or liability on

Consequently, the granting of summary judgment with respect to Plaintiff's negligence, products liability, and implied warranty claims on grounds of preemption would be improper.[6]

## II. Economic Loss Rule

Defendant also seeks a ruling that Plaintiff's negligence, intentional/negligent misrepresentation, and products liability claims are barred by the economic loss rule because Plaintiff's damages reflect purely economic losses.  Plaintiff asserts that the rule is inapplicable because the defective feed damaged its "other property."

---

Defendant that conflicts with the FDCA.  Absent a GRAS determination during the relevant time period, if the only way Defendant could consistently provide feed containing Plaintiff's minimum taurine requirements was to supplement with taurine, in violation of the FDCA and 21 C.F.R. § 573.980, Plaintiff's state law claims would be preempted.

[6] Defendant argues that the foregoing claims are impliedly preempted because they stand as an obstacle to accomplishing federal objectives.  For the reasons stated above, this could only be so if there was no dispute that taurine supplementation was required to produce a feed with adequate taurine levels.

22

The economic loss rule bars causes of action "where a plaintiff alleges a purely economic loss stemming from injury only to the product itself."[7] State of Hawaii ex rel. Bronster v. U.S. Steel Corp., 82 Hawai'i 32, 39, 919 P.2d 294, 301 (1996); City Express, Inc. v. Express Partners, 87 Hawai'i 466, 469, 959 P.2d 836, 839 (1998).  It

> marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others.  The economic loss rule was designed to prevent disproportionate liability and allow parties to allocate risk by contract.

City Express, 87 Hawai'i at 469, 959 P.2d at 839 (quoting Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist., 881 P.2d 986, 989-90 (Wash. 1994) (en

---

[7] This rule is codified at Hawaii Revised Statutes ("HRS") § 663-1.2, BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., 780 F. Supp. 2d 1061, 1082 (D. Haw. 2011), which provides that "[n]o person may recover damages, including punitive damages, in tort for a breach of a contract in the absence of conduct that:  (1) Violated a duty that is independently recognized by principles of tort law; and (2) Transcended the breach of the contract."  Haw. Rev. Stat. § 663-1.2.

23

banc)) (quotations omitted).  Damage to a product

itself is most appropriately a warranty claim.

Bronster, 82 Hawai'i at 40, 919 P.2d at 302.  "Such

damage means simply that the product has not met the

customer's expectations, or, in other words, that the

customer has received 'insufficient product value.'"[8]

Id. (citation omitted).  Under the economic loss rule,

"a manufacturer in a commercial relationship has no

duty under either a negligence or strict products

liability theory to prevent a product from injuring

itself."  Leis Ltd. Family P'ship v. Silversword

Eng'rg, 126 Hawai'i 532, 538-39, 273 P.3d 1218, 1224-25

(Haw. Ct. App. 2012) (quoting Bronster, 82 Hawai'i at

39, 919 P.2d at 301).  The rule also applies to

negligent design and/or manufacture theory, Bronster,

82 Hawai'i at 40, 919 P.2d at 302, and negligent

---

[8]  Defendant encourages this Court to adopt other
jurisdictions' "disappointed expectations" test.
Plaintiff correctly asserts that the Hawaii Supreme
Court has not adopted this test, and this Court
declines to do so.  However, Defendant's focus on a
plaintiff's expectations and value received are not
without basis, as they both serve as the underlying
rationale behind the economic loss rule.

misrepresentation.  <u>City Express</u>, 87 Hawaiʻi at 470,
959 P.2d at 840 (holding that "in the context of
construction litigation regarding the alleged
negligence of design professionals, a tort action for
negligent misrepresentation alleging damages based
purely on economic loss is not available to a party in
privity of contract with a design professional").[9]

The most recent Hawaii Supreme Court case
addressing the economic loss rule in the construction
context, <u>Ass'n of Apartment Owners of Newtown Meadows
ex rel. its Board of Directors v. Venture 15</u>, 115
Hawaiʻi 232, 167 P.3d 225 (2007), held that recovery in
negligence is barred, even in the absence of privity of
contract, "when allowing such recovery would blur the
distinction between contract and tort law."  <u>Id.</u> at

_____

    [9]  As noted by Defendant, the Intermediate Court of
Appeals has clarified that the <u>City Express</u> court's
rationale was not limited to design professionals.
<u>Leis</u>, 126 Hawaiʻi 532, 538 n.6, 273 P.3d 1218, 1224
n.6.  This district has also concluded that the
economic loss doctrine could apply to negligent
misrepresentation claims.  <u>Burlington Ins. Co. v.
United Coatings Mfg. Co., Inc.</u>, 518 F. Supp. 2d 1241,
1254 n.10 (D. Haw. 2007).

25

292, 167 P.3d at 285; <u>Leis</u>, 126 Hawaiʻi at 538, 273

P.3d at 1224 ("<u>Newtown Meadows</u>, although a construction

case not involving design professionals, clearly stands

for the proposition that the economic loss doctrine

bars the recovery of purely economic losses, even in

the absence of privity of contract, so long as

'allowing such recovery would blur the distinction

between contract and tort law.'").  At issue in <u>Newtown</u>

<u>Meadows</u> was whether the plaintiff's damages[10] were

"purely economic losses" and whether "other property"

was damaged, i.e. cracked floor tile, demising walls,

skewed door jambs and windows, damage caused by

termites entering through floor cracks, as a result of

the negligent construction of concrete slabs.  <u>Newtown</u>

<u>Meadows</u>, 115 Hawaiʻi at 293, 167 P.3d at 286.

---

[10]   The plaintiff sought the following damages: "(1)
damage to the units at Newtown Meadows; (2) a
continuous exposure to conditions which resulted in
damage to the units; (3) loss in value of the units;
(4) the costs of experts; (5) an increase in
maintenance costs; (6) the cost to remedy the defects;
and (7) 'other consequential damages.'"  <u>Newtown</u>
<u>Meadows</u>, 115 Hawaiʻi at 294, 167 P.3d at 288.

The court concluded that the plaintiff's damages consisted of purely economic losses, and noted that the plaintiff did not seek damages for personal injuries.  Id. at 294, 167 P.3d at 287.  In reaching this conclusion, the Court relied on cases applying the economic loss rule to situations where the defective product is a component of an integrated system/structure and causes damage to other components of the system/structure because the damage is to the defective product itself, not "other property."  Id. at 293-94, 167 P.3d at 286-87.  The court further held that "even assuming *arguendo* that the cracked floor tiles, demising walls, skewed door jambs and windows, and damage caused by termites entering through the cracks were caused by the allegedly defective floor slabs, such consequential damages do not constitute damage to 'other property.'"  Id. at 294-95, 167 P.3d at 287-88.

This district has interpreted Newtown Meadows to extend the reach of the economic loss rule to

27

preclude "purely economic losses including

'consequential damages' to property other than the

allegedly defective product." Burlington, 518 F. Supp.

2d at 1254 (citation omitted).[11]

"Economic losses encompass 'damages for

inadequate value, costs of repair and replacement of

[the] defective product, or consequent loss of

profits-without any claim of personal injury or damage

to other property.'" Newtown Meadows, 115 Hawai'i at

---

[11]   Plaintiff mischaracterizes the Burlington
holding as dicta.  In actuality, it was an alternative
basis for the Burlington court's ruling.  Burlington,
518 F. Supp. 2d at 1252.  The Burlington court elected
to consider and discuss the economic loss doctrine, and
this Court will not disregard that portion of the
opinion just because it was not the primary basis for
the court's ruling.  Plaintiff additionally argues that
Burlington misconstrued Newtown Meadows.  The Court
disagrees.  Although the Burlington court did not
summarize or discuss the rationale behind the Newtown
Meadows decision, the Newtown Meadows court indeed
found that under the facts before it, purely economic
losses, including consequential damages to property
other than the allegedly defective product, were barred
by the economic loss rule.  As this Court summarized
above, the Newtown Meadows court reached this
conclusion by reasoning that said damages were not
"other property."  The Court acknowledges, however,
that because application of the economic loss rule is
fact specific, the Burlington court's interpretation
may not be applicable to all cases.

293, 167 P.3d at 286 (citations and quotations omitted)
(alteration in original); City Express, 87 Hawai'i at
469, 959 P.2d at 839 (in cases involving negligent
design of building, economic loss damages are those
pertaining solely to the costs related to the operation
and value of the building itself, i.e. additional
costs, lost rent, the cost of remedying the alleged
building defects, and the difference between the value
of the building as designed and the value it would have
had if it had been properly designed; personal injuries
caused by the defective design or damage to property
other than the building itself are excluded);
Millenkamp v. Davisco Foods Int'l, Inc., 391 F. Supp.
2d 872, 808 (D. Idaho 2005) ("'Economic loss' includes
costs of repair and replacement of defective property
which is the subject of the [litigation], as well as
commercial loss of profits or use . . . Alternatively,
property damage encompasses damage to property other
than that which is the subject of the [litigation].")
(citations omitted).

Plaintiff submits that its tort claims are not barred by the economic loss rule because the feed damaged its fish, i.e. "other property."  An exception to the rule exists when the finished product causes damage to "other property." Kawamata Farms, Inc. v. United Agric. Prods., 86 Hawai'i 214, 254, 948 P.2d 1055, 1095 (1997). Kawamata involved allegations by the plaintiffs that Benlate, an agricultural fungicide, damaged their plants, soil, and farm structures. Id. at 221, 948 P.2d at 1062.  Following trial, the jury awarded compensatory and punitive damages based on the injury to the plaintiffs' crops. Id. at 227, 948 P.2d at 1068.  The jury did not award damages for soil or farm structure restoration. Id. at 228, 948 P.2d at 1069.

The defendants filed a motion for judgment notwithstanding the verdict, arguing that the economic loss doctrine barred recovery in tort given the jury's conclusion that the plaintiff's injuries were a result of "economic loss" rather than damage to soil or farm

30

structures.  Id.  In denying the motion, the circuit

court concluded in pertinent part that "[t]he majority

of Plaintiffs' compensatory damages awarded by the jury

were for plant replacement costs for the damages to

Plaintiffs' plant inventory [that] constitutes 'other

property,' which therefore brings this case out of the

realm of the economic loss doctrine."  Id. (alterations

in original) (quotations omitted).  The Hawaii Supreme

Court affirmed the circuit court decision, holding that

> the Plaintiffs bargained for Benlate as
> the finished product, and this finished
> product damaged 'other property'
> consisting of the Plaintiffs' crops upon
> which Benlate was applied.  Where the
> finished product caused damage to other
> property, the economic loss doctrine does
> not apply, and, thus, the economic loss
> doctrine did not bar the Plaintiffs from
> recovering damages for their crop damage.

Id. at 254, 948 P.2d at 1095.

At first glance, Kawamata appears to be

directly on point.  However, upon closer examination of

the facts, there are critical distinctions between

Kawamata and this case.  Plaintiff submits that it may

recover in tort for the physical injury to its fish

31

caused by the defective feed.  Yet it does not seek
damages for physical injury to its fish.  Instead, it
bases its damages theory "on a lost profits methodology
which considers financial losses as well as avoided
costs over a damage period, or period of restoration,"
and it seeks damages for lost revenue, actual feed cost
incurred, and additional costs incurred.[12]  Def.'s CSF,
Johnson Decl., Ex. M at 3.  All of these types of
damages constitute economic losses under Hawaii law.

By contrast, the damages awarded in <u>Kawamata</u>
were for injury to the plaintiffs' plants; specifically, the replacement costs for the plants,
i.e. "other property."  Insofar as Plaintiff does not
seek damages for injury to its fish, the Court finds
that the economic loss rule bars recovery with respect
to Plaintiff's negligence, products liability, and
negligent misrepresentation claims.  <u>Millenkamp</u>, 391 F.
Supp. 2d at 875-79 (in a breach of warranty and
negligence case alleging that milk permeate caused the

---

[12]  Plaintiff admits that this is its damages
theory.  Pl.'s CSF at 2.

32

death of calves, the court found that because the

plaintiffs sought purely economic damages and no

exception to the economic loss rule applied to the

facts and circumstances of the case, summary judgment

was appropriate as to the plaintiffs' negligence and

negligence per se claims).

This conclusion is consistent with the legal

principles set forth in Newtown Meadows and Burlington,

even though this case is factually distinguishable in

that it is not construction litigation.  Neither

Newtown Meadows nor Burlington[13] limited their holdings

to the construction context.[14]  Accordingly, this

Court's decision to apply the economic loss rule, which

---

[13]    Burlington was an insurance declaratory action,
but the underlying state court action involved a
defective topcoat used in the repair and repainting of
residential buildings.  Burlington, 518 F. Supp. 2d
1241.

[14]    "The legal principle enunciated in Newtown
Meadows is of general applicability." Leis, 126
Hawai'i 532, 538 n.7, 273 P.3d 1218, 1224 n.7.
Moreover, like the plaintiff in Newtown Meadows, who
did not seek damages for personal injuries caused by
the allegedly defective concrete floor slabs, Plaintiff
is not seeking damages for physical injuries to its
fish caused by the allegedly defective feed.

33

is founded upon Plaintiff's purely economic damages theory and the absence of damages for injury to the fish, is further supported by the foregoing cases. That is, to the extent Plaintiff's economic damages could be construed to relate to the fish or to property other than the allegedly defective feed, they would be precluded.  <u>Burlington</u>, 518 F. Supp. 2d at 1254; <u>Newtown Meadows</u>, 115 Hawai'i at 293-95, 167 P.3d at 286-88.  The Court recognizes that the feed and fish are not part of an integrated structure or system, but as already discussed, its decision is predicated on the fact that Plaintiff does not seek damages for injury to the fish, i.e. "other property."

Having concluded that the economic loss rule applies, the Court must determine whether it bars Plaintiff's intentional misrepresentation claim.  As earlier discussed, the Hawaii courts have held that the rule applies to negligence, products liability, and negligent misrepresentation claims.  They have not, however, authorized the application of the rule to

34

intentional misrepresentation claims.  In the absence
of state court precedent extending the economic loss
rule to intentional misrepresentation claims, the Court
declines to extend the rule here.  Accordingly, the
Court finds that the economic loss rule bars
Plaintiff's negligence, products liability, and
negligent misrepresentation claims, and grants summary
judgment in Defendant's favor as to said claims.

Insofar as the economic loss doctrine bars
Plaintiff's products liability claim, Plaintiff and
Defendant's summary judgment motions concerning the
applicability of the res ipsa loquitur doctrine are
denied as moot.

III. <u>Intentional Misrepresentation</u>

Defendant moves for summary judgment on the
ground that it did not make any actionable
misrepresentation claims.  To prove a claim of
intentional misrepresentation, a plaintiff must
establish that "(1) false representations were made by
defendants, (2) with knowledge of their falsity (or

35

without knowledge of their truth or falsity), in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." Shoppe v. Gucci Am., Inc., 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000).  "To be actionable, the alleged false representation must relate to a past or existing material fact and not the occurrence of a future event."  Id. (citation omitted).

Plaintiff's misrepresentation claims are based on four representations made by Defendant.

A.   Feed Formulation

The first alleged misrepresentation made by Mr. Beattie was that the Kona Pacific feed formulation did not change since early 2008.  Defendant contends that this is not an actionable misrepresentation because minor changes in raw material concentrations between different feed orders do not constitute a change in the formula.  Plaintiff accuses Defendant of manufacturing a distinction between the words "formula" and "raw material concentrations."  Plaintiff points to

36

Defendant's formulation data to establish that changes
in raw material concentrations constitute a change in
the formula.  Pl.'s CSF, Ex. 11.

A close examination of the evidence reveals no
disputed issues of material fact, even viewing such
evidence in a light most favorable to Plaintiff.
According to Defendant, it uses a "least cost
formulation" to select the most cost effective
ingredients in its inventory that still satisfy the
nutrient requirements and raw material limitations set
in the formula.  Def.'s CSF, Johnson Decl., Exs. C & P.
Indeed, Greg Deacon testified that that the feeds are
produced using a feed formulation program, with
ingredient parameters set by a formulator.  Def.'s CSF,
Johnson Decl., Ex. C.  He further testified that when
Kona Blue requested a change to the poultry meal feed
in 2007, he probably lowered the feed's fishmeal
content to 20%.  Id.

Mr. Shaw similarly testified that Defendant
used a program called "Format" to formulate its diets,

wherein minimum and maximums for every product by size were set within Format's parameters.  Def.'s CSF, Johnson Decl., Ex. P.  Mr. Shaw also stated that Format determines which raw materials are best for use on a particular day.  Id.  The formulation data cited by Plaintiff establishes that ingredient percentages changed over time, which is consistent with the undisputed facts, including Mr. Madsen's testimony that Mr. Beattie explained that ingredients may vary over time.  Pl.'s CSF, AMF at ¶ 11, Ex. 2; Def.'s Reply CSF at ¶ 11; Def.'s CSF, Johnson Decl., Ex. B.  Therefore, the evidence establishes that Mr. Beattie accurately represented that the formula did not change because any variation in the ingredient content still fell within the formula's parameters/restrictions.  For example, notwithstanding the fact that the ingredient percentages changed over time, as reflected in the formulation data, the fishmeal numbers referenced by Plaintiff demonstrate that the fishmeal level always exceeded the 20% formulation level set by Mr. Deacon

for the Kona Pacific poultry meal feed.

Based on the foregoing, the Court hereby finds, as a matter of law, that Mr. Beattie's statement about a lack of change to the formula since 2008 was not a false representation.

B.   Successful Growth

The second alleged misrepresentation is Mr. Beattie's statement that Kona Blue had successfully grown *Seriola rivoliana* on the Kona Pacific poultry meal feed, despite his knowledge that Kona Blue had experienced similar feeding and growth problems after switching to said feed.  Kona Blue reported to Defendant in July 2008 that it experienced some of the best fish survival in company history.  Pl.'s CSF, Ex. 20.  Citing communications between Kona Blue and Mr. Beattie several months later, which expressed Kona Blue's concern about feeding and growth issues, Plaintiff asserts that a genuine issue of material fact exists.  The Court disagrees.

The issues with growth and feeding around October 2008 were later determined to be caused by overstocking, skin flukes, and strep infection.  Def.'s Reply CSF, Supplemental Johnson Decl., Ex. B.  In addition, Kona Blue reported successful results for nearly two years while its fish were consuming the feed.  Def.'s CSF, Beattie Decl. at ¶ 6.  Thus, Plaintiff has not come forward with significant probative evidence tending to support its legal theory that Mr. Beattie misrepresented Kona Blue's success with the Kona Pacific poultry meal feed.

It is worth noting too, that Plaintiff had access to Kona Blue's records prior to its acquisition of the aquafarm, so Plaintiff had at its disposal information to confirm Kona Blue's success, or lack thereof, using the Kona Pacific poultry meal feed.  By the time Plaintiff assumed control of the aquafarm in February 2010, the fish had been consuming the Kona Pacific poultry meal feed for approximately two years. For these reasons, the Court grants Defendant's Motion

as to representations about the growth of the fish on
Kona Pacific feed.

### C.   Taurine Concentration in Feed

The third alleged misrepresentation concerned
the taurine concentration level in the Kona Pacific
poultry meal feed, which Plaintiff alleges Mr. Shaw
falsely represented.   Mr. Shaw provided estimated
levels of taurine and calculated a weighted average of
taurine for all feed sizes around 0.17% on June 7,
2011, a fact undisputed by Plaintiff.   However, just
one day prior, Defendant stopped purchasing the Kona
Pacific poultry meal feed and ordered the Kona Pacific
high fishmeal feed.   Defendant asserts that in view of
these facts, Plaintiff cannot establish that it relied
on Mr. Shaw's representations about the taurine
content.   The Court agrees.

Plaintiff cannot reasonably contend that it
relied on a statement/representation about taurine
content in the Kona Pacific poultry meal feed when it
had already stopped purchasing the feed and decided to

purchase the high fishmeal feed.  Plaintiff failed to
respond to Defendant's arguments about this alleged
misrepresentation so the Court assumes that Plaintiff
has waived any arguments concerning said
representation.  There being no opposition by
Plaintiff, and the Court finding that no genuine issues
of material fact exist, Defendant is entitled to
summary judgment.

D.  Appropriateness and Fitness of Feed

Lastly, Plaintiff claims that in July 2010, Mr.
Beattie misrepresented that the Kona Pacific feed
formulation was appropriate and fit for use with
*Seriola rivoliana*.  Defendant submits that this
statement is not actionable because a misrepresentation
claim cannot be based on mere broken promises or
unfulfilled predictions or expectations.  Defendant
also characterizes Mr. Beattie's statement as sales
talk or "puffing."

Plaintiff does not challenge Defendant's
argument that a representation cannot consist of broken

42

promises of unfulfilled predictions or expectations,

countering only that Mr. Beattie's statement was not

"puffing," but an actionable statement that was

sufficient to deceive.  Hawaii law is clear that a

misrepresentation claim

> *cannot be predicated on statements which*
> *are promissory in their nature or*
> *constitute expressions of intention, and*
> *an actionable representation cannot*
> *consist of mere broken promises, or*
> *erroneous conjectures as to future events,*
> *even if there is no excuse for failure to*
> *keep the promise, and even though a party*
> *acted in reliance on such promise.*

Id. (quoting Stahl v. Balsara, 60 Haw. 144, 149, 587

P.2d 1210, 1214 (1978)).  As discussed with respect to

the second alleged misrepresentation (subsection B),

Mr. Beattie believed that the fish had successfully

grown on the Kona Pacific feed.  Thus, even accepting

Plaintiff's factual allegations as true, Plaintiff has

not set forth significant probative evidence that Mr.

Beattie made a false statement, and certainly not that

he knew of the falsity of the statement, assuming it

was false.  Furthermore, the promissory nature of the

43

representation makes its non-actionable.  Accordingly,
the Court grants summary judgment on Plaintiff's
intentional misrepresentation claim.

IV.  Implied Warranty of Merchantability

        Defendant argues that it is entitled to summary
judgment on Plaintiff's breach of implied warranty of
merchantability claim because no warranty attached to
the custom designed Kona Pacific meal feed, which was
for an unknown species and thus had no ordinary
purpose.  Plaintiff counters that a warranty attaches
to all products, even those that are custom made.
Plaintiff submits that the issue of whether the feed
was defective or unfit for the ordinary purposes for
which it was used is disputed.

        The implied warranty of merchantability is
arguably the broadest warranty in the Uniform
Commercial Code, and is "implied by operation of law
into every sale of goods by a merchant seller." Ontai
v. Straub Clinic and Hosp. Inc., 66 Haw. 237, 249-50,
659 P.2d 734, 744 (1983) (citations omitted).

44

Merchantability means, among other things, that goods "[a]re fit for the ordinary purposes for which [they] are used."  Haw. Rev. Stat. § 490:2-214(2)(c);[15] <u>Ontai</u>,

_____

[15]   Hawaii Revised Statutes ("HRS") § 490:2-314 provides:

> (1) Unless excluded or modified (section 490:2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as:
>
> (a) Pass without objection in the trade under the contract description; and
>
> (b) In the case of fungible goods, are of fair average quality within the description; and
>
> (c) Are fit for the ordinary purposes for which such goods are used; and
>
> (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) Are adequately contained, packaged, and labeled as the agreement may require; and

45

66 Haw. at 250, 659 P.2d at 744.  In a breach of

implied warranty of merchantability claim, the

plaintiff must show that "(1) the seller is a merchant

of such goods; and (2) the product was defective or

unfit for the ordinary purpose for which it is used."

Neilsen v. Am. Honda Motor Co., Inc., 92 Hawai'i 180,

190, 989 P.2d 264, 274 (Haw. Ct. App. 1999).

The Court begins its discussion by addressing

the custom product exception advanced by Defendant.

Relying on out of state/circuit cases, Defendant

contends that the implied warranty of merchantability

did not attach because the feed was a custom product.

Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d

416, 424 (6th Cir. 1981) (holding that no warranty of

merchantability could arise from a sale of components

---

(f) Conform to the promises or
affirmations of fact made on the container
or label if any.

(3) Unless excluded or modified (section
490:2-316) other implied warranties may
arise from course of dealing or usage of
trade.

Haw. Rev. Stat. § 490:2-314

to be installed in a highly complex piece of machinery
because the components had never been used in machinery
of that type and the machinery itself was new and had
never been operated; under such circumstances, no usual
standards for determining ordinary performance could be
determined); Norcold, Inc. v. Gateway Supply Co., 798
N.E.2d 618, 624-25 (Ohio Ct. App. 2003) (holding that
granting of summary judgment was proper as to breach of
implied warranty of merchantability claim because the
product at issue was a newly created component made
especially for the plaintiff and "'no average or usual
standards for determining ordinary performance or
quality for the components c[ould] be determined'
because the parts had never previously been
manufactured"). The Court does not refute that these
cases stand for the propositions for which Defendant
has cited them. However, they are inapplicable and
distinguishable. For one, the Hawaii courts have not
adopted the custom product exception, and the Court
believes that it would be inappropriate to consider

said exception in the present case.

Second, even if the Court were to consider the custom product exception, it would find that the exception does not apply.  The basis for the rulings in the cases cited by Defendant was that there were no usual standards for determining ordinary performance in the new products.  Given the facts presented here, the Court could not reach the same conclusion as those cases.  The Kona Pacific poultry meal feed was not a newly created feed made especially for Plaintiff; it was created in 2007 for Kona Blue and had been sold for over two years by the time Plaintiff assumed control of the aquafarm.  Arguably then, usual standards for determining ordinary performance could be ascertained.

In view of the inapplicability of the custom product exception, the issue is whether Defendant is entitled to summary judgment based on the evidence before the Court.  The answer is clearly no.  There is a genuine issue of material fact concerning the second element of this claim - whether the feed was defective

or unfit for the ordinary purpose for which it was
used.  Accordingly, the Motion is denied as to
Plaintiff's breach of implied warranty of
merchantability claim.

In a footnote, Defendant also argues that
Plaintiff cannot prevail because it is undisputed that
the feed was merchantable given Plaintiff's resale of
the excess Kona Pacific feed to other farmers.
Plaintiff clarifies that it did not resell the feed to
Seriola commercial farmers; it sold the feed to Kona
Blue for a research trial, an agricultural
management/consulting service company, and a hotel and
pond service company.  Pl.'s CSF at ¶ 34.  The Court
rejects Defendant's argument because "[t]he right of a
buyer to bring suit against a seller for breach of an
implied warranty of merchantability is not affected by
the fact that the former has resold the goods to a
third party."  26 Am. Jur. Proof of Facts 2d 1.  Thus,
summary judgment is improper.

V.   <u>Implied Warranty of Fitness for a Particular
     Purpose</u>

     A.   <u>Disclaiming Language on the Product Sheet</u>

          Defendant's first argument is that Plaintiff's

breach of implied warranty for a particular purpose

claim fails because it disclaimed the warranty on its

product sheets.  Plaintiff counters that there is no

disclaimer language in the contract and any language on

the product sheets does not count because the product

sheets were not incorporated into the contract.  Even

if the product sheet was incorporated into the

contract, Plaintiff asserts that the product sheet did

not contain a disclaimer because the statement is in

small font at the bottom of the page and is not

conspicuous.

          The implied warranty of fitness for a

particular purpose is narrower and more specific than

the implied warranty of merchantability.  <u>Ontai</u>, 66

Haw. at 250, 659 P.2d at 744 (citation omitted).

"[T]he essential components of an implied warranty of

fitness are that the seller has reason to know of the

particular purpose for which the goods are required, and that the buyer relies on the seller's expertise in supplying a suitable product." Id.; Haw. Rev. Stat. § 490:2-315.[16]  To establish a breach of implied warranty for fitness of purpose claim, a plaintiff must prove that:  "(1) the plaintiff desired a product for a particular purpose; (2) the defendants had reason to know about this purpose; and (3) the product sold to the plaintiff failed to meet that purpose." Neilsen, 92 Hawai'i at 191, 989 P.2d at 275.  "Whether or not [the implied warranty of fitness for purpose] arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting."

---

[16]   HRS § 490:2-315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Haw. Rev. Stat. § 490:2-315.

51

Ontai, 66 Haw. at 250, 659 P.2d at 744.

The implied warranty of fitness may be disclaimed as long as it is in writing and conspicuous.[17]  Haw. Rev. Stat. § 490:2-316(2) ("(2) Subject to subsection (3), . . . to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.  Language to exclude all implied warranties of fitness is sufficient if it

---

[17]  "Conspicuous"

means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(1) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(2) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Haw. Rev. Stat. § 490:1-201.

52

states, for example, that 'There are no warranties
which extend beyond the description on the face
hereof'."). Warranty exclusions are authorized so that
parties may bargain to allocate the risk of loss.
<u>Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.,</u>
<u>Inc.</u>, 890 F.2d 108, 113 (9th Cir. 1989). Exclusions of
warranties are generally disfavored, and standardized
take it or leave it form contracts are construed
against the drafter, "subject to the general obligation
of good faith and of not imposing unconscionable terms
upon a party." <u>Id.</u> (citing Rest. (Second) of Contracts
§ 211). HRS § 490:2-316 "seeks to protect a buyer from
unexpected and unbargained language of disclaimer by
denying effect to such language when inconsistent with
language of express warranty and permitting the
exclusion of implied warranties only by conspicuous
language or other circumstances which protect the buyer
from surprise." Haw. Rev. Stat. § 490:2-316, comment
1.

In the present case, Defendant's disclaimer is not "conspicuous" as defined by HRS § 490:1-201.[18] Subparagraphs (1) and (2) in HRS § 490:1-201 describe methods for calling attention to terms.  Haw. Rev. Stat. § 490:1-201, comments.  However, the test "is whether attention can reasonably be expected to be called to it.  The statutory language should not be construed to permit a result that is inconsistent with that test."  Id.

Defendant's disclaiming language is at the bottom of the product sheet, in the same font as the main text, but smaller.  Moreover, there is no heading

---

[18]  Plaintiff argues that conspicuousness requires that language "make plain that there is no implied warranty" by using expressions such as "as is" or "with all faults," and that such "magic words" must be used.  Plaintiff is manufacturing requirements that do not exist.  HRS § 490:2-316(a)(3) provides:  "Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."  Haw. Rev. Stat. § 490:2-316(a)(3) (emphasis added).  In other words, the disclaimer need not be limited to these "magic words"; other language may suffice.

separating it from the text above.[19]  Def.'s CSF, Ex. A,
Ex. 804 at KBDD-198130.  Defendant relies on an out-of-
district case, <u>Fargo Machine & Tool Co. v. Kearney &
Trecker Corp.</u>, 428 F. Supp. 364 (E.D. Mich. 1977), for
the proposition that a small print disclaimer is
conspicuous when provided on a single sheet with
minimal other text.  That case is inapposite.  The
<u>Fargo Machine</u> court's ruling was not based simply on
whether the visual appearance of a provision of the
terms and conditions attached to a purchase order was
sufficiently conspicuous; it considered a number of
factors in determining whether the disclaimer satisfied
U.C.C. § 2-316 (identical to HRS § 490:2-316), one of
which was the appearance of the disclaiming language.
The disclaiming language was bold titled "WARRANTY OF
MATERIAL AND WORKMANSHIP," it was only one of fourteen

---

[19]  Because the copy presented to the Court is in
black and white, the Court cannot discern whether the
disclaimer language is a different color that the other
text.  Even if the disclaimer language was in a
different color, it would not become conspicuous
because the size of the text would need to be the same
or larger than the surrounding text.

55

separate sections on a single page, and it was the only

one dealing with a warranty provision.  <u>Fargo</u>, 428 F.

Supp. at 372; <u>see also</u>, <u>e.g.</u>, <u>Strojny v. PermaDri,</u>

<u>Inc.</u>, Civil No. 11-00131 LEK-KSC, 2012 WL 4718099, at

*14 (D. Haw. Sept. 20, 2012) (finding that the limited

warranty provision on the product label was

conspicuous).[20]

        The disclaimer at issue here contains no such

heading or distinctive font to call attention to it.

As a result, the Court finds that it is not

conspicuous.  <u>Office Supply Co., Inc. v. Basic/Four</u>

<u>Corp.</u>, 538 F. Supp. 776, 784 (D.C. Wis. 1982) (finding

that disclaimers were not conspicuous because they were

on the reverse side of the first two pages of the

contract; they were not positioned near the buyer's

signature line; the print, though italicized, only

---

        [20]  The disclaiming language was in a column by
itself (the remainder of the text on the label was in a
separate column), in equal or larger size font than the
other text on the label of the product, portions of the
language were capitalized, and the language contained
the bold, capitalized heading "LIMITED WARRANTY."
<u>Strojny</u>, Civil No. 11-00131 LEK-KSC, Doc. No. 36, Ex. B
to Ex. 1.  No such factors exist here.

slightly contrasted with the remainder of the contract;

and there were no headings).

The Court's inquiry does not end there,

however.

> Whether a disclaimer is conspicuous is not
> simply a matter of measuring the type size
> or looking at the placement of the
> disclaimer within the contract.  A
> reviewing court must ascertain that a
> reasonable person in the buyer's position
> would not have been surprised to find the
> warranty disclaimer in the contract.

Sierra Diesel, 890 F.2d at 114; Va. Sur. Co., Inc. v.

Am. Eurocopter Corp., 955 F. Supp. 1213, 1217 (D. Haw.

1996).  Factors to be considered are the sophistication

of the parties and the circumstances of the negotiation

and signing.  Id.  Notably, as Plaintiff has pointed

out, there is no dispute that the product sheets were

not part of the contract.  Defendant contends that

there is no requirement that disclaimers need to be

incorporated into a contract.  Yet, nearly all of the

cases it relies upon involved a disclaimer in a

contract.[21]   In <u>Fargo Machine</u>, for example, the

disclaimer was one of the sections in the terms and

conditions attached to the purchase order.

<u>Fargo Mach.</u>, 428 F. Supp. at 371-72.   The Court's

decision turned on the following:   the sophistication

of the buyer experienced in commercial dealings; the

equal bargaining position of the parties given that the

buyer had changed provisions which had been

unacceptable to it; the language itself was clearly and

---

[21]   Defendant cites <u>D.O.V. Graphics, Inc. v. Eastman Kodak Co.</u>, 347 N.E.2d 561 (Ohio Ct. Com. Pl. 1976), for the proposition that courts have enforced disclaimers for products that were not specifically incorporated into a contract.   D.O.V. involved a disclaimer that was printed on each package of paper delivered, and which had to be cut open.   <u>Id.</u> at 562.   The <u>D.O.V.</u> court ultimately concluded that the contract between the parties included the limitation of liability.   <u>Id.</u> at 563.   The court reasoned that while there was no evidence that the limitation of liability was negotiated, the plaintiff knew the use of the paper and that the defendant's liability was limited to replacing the defective paper.   The court held that the contract for the allegedly defective paper "consisted of plaintiff's order for paper knowing that defendant was limiting his liability for any commercial damages flowing therefrom and its acceptance of the package of paper on which such limitation of liability was set forth."   <u>Id.</u>   Thus, the court made a determination that the disclaimer on the package of paper delivered became part of the contract.

conspicuously designated as a warranty; and the buyer's president testified that he knew of the warranty paragraphs, had read them, and was familiar with the contents.  Id. at 372; Velez v. Craine & Clarke Lumber Corp., 41 A.D.2d 747, 748 (N.Y. App. Div. 1973), reversed by 305 N.E.2d 750 (N.Y. 1973) (disclaimers appear on invoice); FMC Fin. Corp. v. Murphree, 632 F.2d 413, 419 (5th Cir. 1980) (disclaimer was a section of the lease agreement); see also Strojny, 2012 WL 4718099, at *14 (considering whether the limited warranty provision on the label of the container became part of the parties' agreement and ultimately holding that material issues of fact existed to preclude a finding that 1) the provision precluded the plaintiffs' claims and 2) the provision is inapplicable or otherwise invalid); Office Supply, 538 F. Supp. at 783-84 (disclaimers were in the contract); O'Neil v. Int'l Harvester Co., 575 P.2d 862, 864 (Colo. Ct. App. 1970) (warranty was disclaimed in the contract); Rehurek v. Chrysler Credit Corp., 262 So.2d 452, 454-55 (Fla.

59

Dist. Ct. App. 1972); <u>Imperial Stamp and Engraving Co.,
Inc. v. Bailey</u>, 403 N.E.2d 294, 297 (Ill. App. Ct.
1980); <u>Christopher v. Larson Ford Sales, Inc.</u>, 557 P.2d
1009, 1012-13 (Utah 1976); <u>cf.</u> <u>LaBella v. Charlie
Thomas, Inc.</u>, 942 S.W.2d 127, 132-33 (Tex. App. 1997)
(disclaimer in a lease).

Not only does the majority of case law involve
contracts, but a finding of conspicuousness often
involves undisputable evidence, generally in the form
of testimony, that a buyer has seen and understood the
disclaimer.[22]  <u>Office Supply</u>, 538 F. Supp. at 784
(deposition testimony from the buyer's president that
he spent two months comparing the purchased system with
other systems; that he drew up written comparisons
between systems, including guarantees; that he read the

_____

[22] Defendant further argues that actual knowledge
obviates any need for conspicuousness.  However, the
cases cited by Defendant did not turn solely on actual
knowledge; the courts there also found that the
appearance of the disclaimers, which were included in
contrast, were conspicuous.  <u>FMC Fin.</u>, 632 F.2d at 419;
<u>Fargo Mach.</u>, 428 F. Supp. at 371-72.  This Court has
determined that the disclaiming language on the product
sheets is not, considering its appearance, conspicuous.

contract prior to signing it; when he received the contract, he made a list of questions, one of which involved the guarantee; before he signed the contract, he showed the warranty provision to someone; and he discussed the warranties with the seller before signing the contract and tried to have them modified, which established that the warranty disclaimers were neither unexpected nor unbargained for); Fargo Mach.,428 F. Supp. at 371-72; Velez, 41 A.D.2d at 748-49 (the job superintendent had actual knowledge of the presence of the disclaimer of warranty of fitness; he had dealt with the defendant for 15 or 16 years and had in his 20 years of experience in the trade seen many invoices; moreover, the disclaimer was placed opposite the total amount of the bill and placed under a conspicuous legend and word "NOTE" which called attention to it).

Without reaching the issue of whether the product sheet became part of the agreement, the Court finds that the evidence does not clearly establish that Mr. Madsen read and knew about the disclaimers, at the

time the parties entered into the contract, even though Kona Blue produced the product sheets as part of Plaintiff's due diligence. In his position as president, Mr. Madsen should arguably have a fairly high level of sophistication in business dealings. Nevertheless, bearing in mind that exclusions are generally disfavored, and viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Defendant has not presented sufficient evidence demonstrating that Plaintiff was aware of the disclaimer. Even if Plaintiff was aware of the disclaimer, the disclaimer itself is not conspicuous. Accordingly, considering the physical appearance of the disclaimer, the sophistication of the parties, and the circumstances of the negotiation and signing, the Court declines to find that Defendant disclaimed the implied warranty of fitness.

   B.   <u>Reliance by Plaintiff on Defendant's Expertise</u>

        Defendant's second argument for granting summary judgment is that Plaintiff did not rely on

62

Defendant in determining whether the feed was appropriate for the fish; that Plaintiff selected the feed based on Kona Blue's success.  Plaintiff represents that it relied on Defendant's expertise to create a feed that met *Seriola rivoliana*'s nutritional requirements.  Based on the evidence submitted by the parties, a genuine issue of material fact exists as to whether Plaintiff relied on Defendant's expertise in supplying a suitable product.

Mr. Madsen attests that he "relied on [Defendant's] global expertise and skill in formulating fish feed in deciding to continue to purchase the Kona Pacific feed from [Defendant]." Pl.'s CSF, Decl. of Todd Madsen ("Madsen Decl.") at ¶ 6.  He further explains that he was aware of Defendant's expertise through websites, advertisements, the product sheet, and discussions with Kona Blue.  Id. Defendant focuses on the fact that it did not make feed recommendations to Plaintiff.  However, Plaintiff is not required to demonstrate that Defendant recommended

the feed to Plaintiff.   The issue is whether Plaintiff

relied on Defendant's "skill or judgment to select <u>or</u>

<u>furnish</u> suitable goods."   Haw. Rev. Stat. § 490:2-315

(emphasis added); <u>Ontai</u>, 66 Haw. at 250, 659 P.2d at

744.   Mr. Madsen claims that he did.   Thus, drawing all

inferences in favor of Plaintiff, as it must, the Court

accepts Mr. Madsen's statement as true for the purposes

of this Motion, and finds that it creates a genuine

issue of fact precluding summary judgment on

Plaintiff's implied warranty of fitness for purpose

claim.

VI. <u>Unjust Enrichment</u>

Defendant seeks dismissal of Plaintiff's unjust

enrichment claim because there is an express contract

between the parties.   Plaintiff counters that if the

Court finds that Plaintiff does not have an adequate

remedy of breach of an implied warranty, then clear

issues of fact exist about whether Plaintiff conferred

a benefit upon Defendant and whether Defendant's

retention of the benefit would be unjust.

"To prevail on an unjust enrichment claim, a plaintiff must show that:  1) it has conferred a benefit upon the defendant, and 2) that the retention of the benefit was unjust."  State Farm Fire and Cas. Co. v. Chung, 882 F. Supp. 2d 1180, 1192 (D. Haw. 2012) (citation omitted).  It is well settled "that equitable remedies are not available when an express contract exists between the parties concerning the same subject matter."  AAA Haw., LLC v. Haw. Ins. Consultants, Ltd., CV. No. 08-00299 DAE-BMK, 2008 WL 4907976, at *3 (D. Haw. Nov. 12, 2008) (citations omitted); Chung, 882 F. Supp. 2d at 1192 ("As a general rule, '[a]n action for unjust enrichment cannot lie in the face of an express contract.'").  Thus, "[w]here the parties to a contract have bargained for a particular set of rights and obligations, all claims involving those express rights and obligations properly lie in contract law and not in equity."  AAA, 2008 WL 4907976, at *3.

Here, there is no dispute that there is a contract between the parties.  Def.'s CSF at ¶¶ 9, 10,

43; Pl.'s CSF at 2 & ¶¶ 9, 10.  Because Plaintiff's allegation that it "conferred a benefit upon Skretting by purchasing Kona Pacific feed and making payment to Skretting," First Amend. Compl. at ¶ 54, arises solely out of the express contract for the sale of the feed, Plaintiff cannot maintain an unjust enrichment claim.

VII.  <u>Breach of Contract Counterclaim</u>

Defendant lastly argues that it is entitled to summary judgment on its breach of contract counterclaim in the amount of $34,654.40 because it is undisputed that Plaintiff failed to pay for the high fishmeal feed that it admitted was satisfactory.  To prevail on a claim for breach of contract, Defendant/Counterclaim Plaintiff must identify "(1) the contract at issue; (2) the parties to the contract; (3) whether [Defendant/Counterclaim] Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by [Plaintiff/Counterclaim] Defendant[]; and (5) when and how [Plaintiff/ Counterclaim] Defendant[] allegedly breached the

contract." <u>Evergreen Eng'rg, Inc. v. Green Energy Team LLC</u>, 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012).

Plaintiff contends that there are material issues of fact as to whether Defendant materially breached the agreement, specifically whether it breached its contractual obligation by providing defective feed. Plaintiff believes that Defendant's material breach of the contract justifies its non-performance. These arguments are not well taken.

Based on the evidence before the Court, there was a valid contract between the parties for the Kona Pacific <u>high fishmeal</u> feed, Defendant delivered the feed, and Plaintiff failed to pay for the feed. Def.'s CSF, Beattie Decl. at ¶ 16 & Ex. J; Johnson Decl., Ex. R. Mr. Madsen has admitted that the high fishmeal feed was sufficient, but that Plaintiff did not pay for the feed because it had paid millions of dollars for defective feed.[23] <u>Id.</u>, Johnson Decl., Ex. R. Defendant

---

[23] This argument rests in part on Plaintiff's treatment of the last contract for the high fishmeal feed as one of many installments. Haw. Rev. Stat. § 490:2-612(3) ("Whenever nonconformity or default with

67

did not materially breach the contract for the high
fishmeal feed.  Consequently, whether or not the Kona
Pacific poultry meal feed was defective is irrelevant
and does not create an issue of material fact that
would preclude summary judgment.  The poultry meal feed
is not the subject of the contract identified in this
counterclaim.  Accordingly, Defendant is entitled to
summary judgment on its counterclaim.[24]

---

respect to one or more installments substantially
impairs the value of the whole contract there is a
breach of the whole.  But the aggrieved party
reinstates the contract if he accepts a nonconforming
installment without seasonably notifying of
cancellation or if he brings an action with respect
only to past installments or demands performance as to
future installments.").  HRS § 490:2-612 is
inapplicable because the contract at issue was not the
same as the previous contract for poultry meal feed.
Moreover, Plaintiff accepted the feed and this action
pertains to alleged defects with the poultry meal feed,
which were the subject of the prior "installment
contracts."

   [24]  Plaintiff submits that this issue should be
decided by a jury when it decides whether the money
paid for the defective feed should be returned.  The
Court disagrees.  Whether or not Defendant is
ultimately held liable and Plaintiff is awarded damages
does not preclude summary judgment when no genuine
issues of material fact exist.  Issues of set off may
be addressed if and when they arise.

CONCLUSION

Based on the foregoing, the Court HEREBY GRANTS
IN PART AND DENIES IN PART Defendant's Motion for
Summary Judgment and DENIES AS MOOT 1) Defendant's
Supplemental Motion for Summary Judgment on the
Doctrine of Res Ipsa Loquitur and Any Similar Theories
and 2) Plaintiff's Motion for Partial Summary Judgment
Re: Circumstantial Evidence Under Strict Products
Liability ("Quasi" - *Res Ipsa*).

Defendant's Motion is granted as to Plaintiff's
negligence (Count 1), intentional/negligent
misrepresentation (Counts 2 and 3); products liability
(Count 4), and unjust enrichment claims (Count 7), and
Defendant's breach of contract counterclaim.
Defendant's Motion is denied as to Plaintiff's implied
warranty of merchantability (Count 5) and implied
warranty of fitness claims (Count 6).

IT IS SO ORDERED.

Dated:  Honolulu, Hawaii, September 4, 2013.



_____
Kevin S.C. Chang
United States Magistrate Judge

CV 11-00675 KSC; <u>KEAHOLE POINT FISH LLC V. SKRETTING CANADA, ET AL.</u>;
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT; ORDER DENYING AS MOOT 1) DEFENDANT'S SUPPLEMENTAL
MOTION FOR SUMMARY JUDGMENT ON THE DOCTRINE OF RES IPSA LOQUITUR AND
ANY SIMILAR THEORIES AND 2) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: CIRCUMSTANTIAL EVIDENCE UNDER STRICT PRODUCTS LIABILITY
("QUASI" - *RES IPSA*)